Search v. Lendingtree. Mr. Kaplan, ready to go? Yes. We may proceed. Thank you, Your Honors. Good morning, Your Honors. Jeff Kaplan from Kaplan, Gilman & Pergamon. Your Honors, I want to begin with the definition of the quote, which is not disputed on this appeal. It's the price and other terms of a transaction in sufficient detail to constitute an offer capable of acceptance. It's also not disputed... Then could there be infringement on this record? If the terms that come back comprise enough that there would be... But by their terms, what you get from Lendingtree is an explanation that this is just a preclearance process, that we have additional steps to go through, that nothing here is a binding offer. Actually, it's quite the reverse, Your Honor. The Lendingtree offer is, in fact, binding, and we've briefed it and we've showed that. There are additional steps, like credit verification, but that is also in our patent. The fact that you and I have a contract that's binding, and we say it's subject to, you know, the interest rate being this or that... There's going to be verification, a verification of information process, W-2 forms, et cetera, you have to go through. And when the... Not an application for credit, but instead a request for loan prequalification? It's not a quote that is an offer, is it? Yes, it is, because when the buyer presents those documents, Lendingtree is not permitted to say, we need more, or there's different terms, or we need some extra stuff. The definition of that is not disputed, Your Honor, and it's also not disputed that you simply cannot return this offer capable of acceptance unless you have some way of integrating the central computer with the vendor computers so that there's some agreed-upon and advanced protocol about how to find everything. Now, this is in our patent, Judge. In Figure 7, it shows this in the data structures. In Figure 8, it shows this. In Column 5, which is reproduced here at A106, it discusses all these additional terms. In Claim 16, which is not an issue here, but the claim itself, Claim 16, talks about assembling all of the information for a quote. And in Column 6, it actually says that the special software that has to be installed in advance at the vendor computers to do this has to be, quote, the quality of goods and services buyers and vendors wish to sell over the network and would change as new goods and services come into existence and old ones are discontinued. Why do you need to do this? Because if you're ordering carpet, you need the software in there to calculate the square footage and figure out what under padding and the installation date, and if you're ordering Type J resistors, you need the information that goes with the Type J resistors. Now, the prior art at best, and we think the closest prior art is FAST, in no less than three, and FAST used a mix of e-mails and faxes and phone calls, but the part that's relevant here is what they call the implant terminals, where it went out and pulled down stuff from what they call an implant terminal. In no less than three places in the FAST documents, at A942, at A953, and at A954, it specifically states that all it's doing is querying a parts database, and it says, if you want to buy spark plugs, you know, Type III spark plugs, 50 cents apiece. It returns a bunch of those to the buyer. The buyer then goes to FAST and says, okay, I'd like, you know, to get two dozen of these, and FAST then goes to the vendor at that point, which may be computerized, it may be faxed, it may be phoned, this is all throughout the FAST documents, and FAST negotiates and says, okay, I queried your database, I saw you have Type III spark plugs. But the district court traverses that by saying the marketplace would have required you, would have required some kind of conversion into computerized form of things that were happening in the brick-and-mortar world. The district court says that, but that's a different issue, Your Honor. The way, and I'm glad you asked that question, because the next point I wanted to make is, how did the district court come to where he came, come to where the court's conclusion came, given that there's no disclosure in any of the prior art to actually pre-establish this tight relationship so you can get all the terms of the offer? How did the district court get there? It's a great question. The way the district court got there, Your Honor, is that in the briefs that the defendants submitted, they lined up the same claim charts that are in this record, which are those colored ones, and they compared the prior art to referral service claims that were in issue at the time and not in issue here. And they went through this lengthy argument, that oral argument, about how the brick-and-mortar corresponded to the claims that, claims I through III, that involved referral services. It then came time to compare the claims that, the claim in issue here, which requires this return of all the terms of a contractual offer. And it's described as a separate embodiment in our patent. They're two separate embodiments. When it came time to compare that, they told the trial judge at oral argument, we really don't have time to go through claim charts of those, and then, I'm not quoting verbatim, but it's essentially the same. And the trial judge clearly, Your Honor, got to where he got by disregarding the limitation for a quote. We agree that the trial judge ruled anybody could take the brick-and-mortar stuff and put it on a computer. But that still doesn't give you the quotes, because the brick-and-mortar referral services don't return quotes. They can't. How did he get over the idea that a quote was not returned? If you look at page 855 to 856, the trial court lays out the differences between the prior art and the claims at issue. He lumped the claims together and said, and you see this at 855 to 856. He says basically what the defendant said. The court says all the claims are essentially computerized filtering. Filtering was old. Computerization was old, so it would have been obvious to computerize filtering. Now, we're not appealing that. What's wrong with that statement? There's nothing wrong with that statement, except if you computerize the brick-and-mortar filtering, you are missing the resulting system does not obtain all the terms of a contractual offer from a remote database and bring them back. And it can't, because you need to have this pre-established protocol that's described in five places in our patent that sets up the software at the vendor computer. You can't just query Thomas Register and say, What is the filtering that happens in the brick-and-mortar world? The filtering that happens in the brick-and-mortar world is the filtering to select vendors. Once those vendors are selected... In other words, I call the ABA and say I need a lawyer and they'll give me a group of four potential DWI. Correct. But what they will not give you is the ABA will not say to you, Give me all the details of exactly what you need. Tell me everything about your case. I'll go out to some lawyers that you don't know and I'll give you a quote. They don't do that. You couldn't do that by computer at the time because you needed these pre-established protocols. Well, they certainly would want to know whether you wanted a plaintiff's lawyer or a defendant's lawyer or whether you had a commercial case or whether you had a negligence or automobile accident or a class action. I mean, they've got to know something. Correct. We are not, for this issue on the return of the quotes, for this issue, we are not disputing the issue of whether you can computerize filtering. It's a kind of different filtering, isn't it? I'm sorry, Your Honor? It's a different filtering. Well, it's a different filtering, but I'm not talking about the filtering with respect to this issue. You're saying that even if you filter, there's no quotes provided. They're going to just give you a bunch of lawyers. You can't return a quote through that system and you can't return a quote through any computerized system because you don't have all of the details to go back and forth. You don't have these tight protocols. Now, lest there be any doubt about this, in the FAST system at page 8956 in the appendix, there's actually an 8956 is a discussion of FAST that came to approximately two years after the 328 patent was filed. And in that discussion, the authors of FAST years later are discussing what are some of the problems that they need to improve upon. And they actually have this discussion that they've now discovered after 10 years of working on FAST that what they need is a way to enable requesters to publicize constraints and responders to return counteroffers structured for the evaluation, meaning that's the real offer with the constraints and the terms of account. This is years after our patent was discovered because the FAST system itself did nothing more than return. This vendor has spark plugs for 50 cents. I didn't understand the appellees as arguing that FAST was conclusively proof of the obviousness of this invention. I thought that was just one of a number of prior art cases that they were using to illustrate the basic proposition. One thing that's helped me with this, I understand your argument, counsel, and your focus on each particular element or facet of your invention in terms of the obviousness analysis, but how does KSR change that? How much do you think KSR changed the need for that kind of element by element analysis as distinct from this sort of broad, I'm sorry to use the phrase, but the court did common sense view of what one knowledgeable or in the art would do? I think that this particular argument, I have a second point I want to make. Of course, the Federal Circuit always had common sense, didn't it? The Supreme Court certainly wasn't suggested that we lacked common sense. Of course not, Your Honor. Thank you. So that's always been part of the test. Your Honor, what I would say about KSR is KSR, I think everyone's in agreement, deals with motivation to combine. KSR does not eliminate the need for the resulting combination, whatever it is. And the fact that KSR said the motivation can come from a broader universe, if you will, does not eliminate the need for the resulting combination to have all of the claim limitations. And what we're saying is, not only was the obviousness summary judgment wrong, but the cross motion for non-obviousness should have been granted because we presented a motion for non-obviousness and with all of the art in any combination you want, use the brick and mortar, use common sense, use fast, use the other e-commerce references, put it together any which way you want. There is no resulting system that obtains all of these detailed terms due to this prearrangement we're talking about and forwards them back. Because in order to do that, the vendor's got to know to set up in advance these parts of the database where the query's going to take place. And that's why that stuff was sort of read out of the claim. The judge treated all the claims the same, and we know some of them don't require the return of a quote. The only second point I wanted to make on this obviousness issue is that this whole idea of the too many problem, which the defendants have based the entire case on and the trial judge ruled upon, the very simple answer to it, which should not be lost in this, is that the problem did not exist. The e-commerce references, the only two references that have to do with purchasing of goods and services over a network at all are FACNET and FAST. The other stuff is document searches that the fees are agreed upon in advance. FACNET and FAST, nothing recognized the too many problem. What happened here is the only way you get there from the too many problem is you have to start with one of those e-commerce references, which were, by the way, affirmatively working to get more quotes because they had a problem. It was 1996, wasn't it? It was 1996. 95 is the relevant invention date, but it probably doesn't change the point. The filing date is 96, February 22nd. So in order to get to this too many problem, you have to start with one of these e-commerce references, which doesn't have this problem. You then have to go to another reference, the document searches that have this. You have to import that problem into the e-commerce reference, like FAST or FACNET, but the document that you're getting that problem from, the document searching system, it already has four solutions. It discusses that. It's in the record. You have to pull the problem into the e-commerce, reject the solutions, and then go to a third reference in the alcohol counseling center or whatever is the brick and mortar referral services, the hardware store, and take that solution to the problem, which didn't exist in the first place, not to mention the fact that the very purpose of the e-commerce reference is broad access and then this computer system can narrow it down and give you the best ones. If you didn't search people on purpose that had better ones, you would destroy the purpose. So the error is that what really happened here, we believe in a nutshell, when you really study the trial court's opinion, is that the first error was that he read a limitation out of the claim. We know this because he treated all the claims the same, and some of them don't have this limitation. And the defendant's argument presented read it out. We know it's error to read limitations out of a claim. The second error was that this path to get from the e-commerce with the problem, the problem didn't exist, and what the trial judge really did to get over that is sort of the three-decade outdated crux of the invention test. There used to be these 20, 30 years ago, the crux of the invention. He basically said filtering's old, computers are old, it's obvious to put filtering on a computer. The problem is that that just doesn't get you to our claim language, and that doesn't provide a path from the prior art. So there's a claim limitation missing, and there's no path to get there other than this too-many problem which didn't exist in the art, and even if it did, there were four better solutions to it. My time's exhausted, so I'd like to save for rebuttal unless there's any other questions. Well, thank you, Mr. Kaplan. You did use your rebuttal time, but we'll give it back to you. Thank you very much, Judge. If you'd be so kind as to give Mr. Stern an extra four minutes, should he need to use it, that'll equalize the time. Okay. Thank you, Your Honor. Good morning, Your Honors. Claude Stern on behalf of the respondent, Lyndon Tree and IEC. First, there's a housekeeping matter that we asked the court to indulge in. As Your Honors know, the court determined below that Claims 1, 2, 3, 13, and 14 were invalid. Claims 1, 2, and 3 were asserted against one of the defendants' service magic. There's no appeal from those determinations. We filed a motion with Your Honors asking the court to dismiss service magic from the case at this point because there's essentially no dispute that there's no pending valid claims being asserted against them. There's been no disagreement from SST's position on that, and so as a practical matter, service magic will be dismissed from this case. With that housekeeping matter addressed, I want to address the merits of the appeal, and if I may... Where do you get a quote in any place in the prior art? Any place. And then, even if you get that, where do you get a motivation to combine all these elements into the claimed invention? Let me address both of those. Thank you. We are here on the record before Judge Debevoise. There is no dispute contrary to the argument that was made to you before, Your Honors, that, in fact, the FAST system returned a quote. And this argument that's being made that there was no quote used in the FAST system is directly contradicted by Dr. Dowling. Dr. Dowling is the expert for SST below. At Your Honors, in the record below, Dr. Dowling submitted his report. That's at A2488 of this record. But the system would return a quote, but the user would have to fill out a separate purchase form, contact the vendor, and consummate the whole transaction outside of the milieu of this invention. That's not necessary. So it would return, along with identifying the lawyer, in the example we've been using here, it would say, and by the way, he generally charges $300 to $500 an hour. And then you'd contact him and say, negotiate it from there, right? That's the FAST system. Actually, Your Honor, that was one feature of the FAST system, but the FAST system also had another feature. It had A943, Your Honor. The vendor was free to accept the offer or to change the offer. It was just the negotiation, the actual deal took place off the system. That's the FAST, at least as I read it. Well, Your Honor, if Your Honor looks at A943, what would happen is the buyer would specify what they wanted, the specific part they wanted, and exactly how much they wanted. That would go into the FAST system. The FAST system had a variety of different enhancements and protocols to be able to search out exactly something in response to that particular request for a quotation. And by the way, just so that we're clear, Dr. Dowling expressly used that phrase. To quote from Dr. Dowling, as can be seen from the foregoing, this is on A2488, FAST receives a request for a quotation, checks to see what vendors might supply the product, and sends a request for quotes to all the vendors who carry the product. Once the quote comes back from the vendor, and then continues. So Dr. Dowling recognized the FAST system, and in fact used a system of requests for quotations and quotes. The point is once the vendor was selected, and that's all FAST did is select vendors and send you the vendors, you had to contact the vendors separately and negotiate the deal. Actually, the FAST system had its own ability to do that. At A943, if I may read, Your Honor, this is from the FAST system as well. Substantial enhancements to this basic flow have been implemented in particular. By the way, is any of this in the district court's opinion? Excuse me? Is any of this in the district court's opinion? No. The district court went an entirely different way. Go ahead. Well, no, Your Honor. Just so that we're clear, the district court's decision, Judge Debeboise, didn't focus with this granularity on the specific art that was cited to it. But it did point out... No, he said nothing more than the market would have led one to computerize this kind of a system. But the systems we had didn't do that. Well, again, focusing on the FAST system... Counsel, we're not really trying to... We're not limited to the district court's opinion, as I'm sure the presiding judge knows. What we're trying to do is decide whether his judgment is supportable or not. So make your point about the FAST system. On the FAST system... The FAST system could come back in a different way, too. It could. It could come back... There was a specific application identified at A943 where the FAST system specifically allowed the vendor to reach an order with the buyer, with the person that was buying. That's described on A943. Now, with respect to the question of what the district court did, the district court did what we think is exactly appropriate in this case. It looked at the world in the terms of the person of ordinary skill and at the tools and at the art that was available to the person of ordinary skill. There is no dispute. And because this is an appeal from a summary judgment motion, there was no dispute about a variety of things. Number one, there was no dispute that this was prior art. Number two, there was no dispute that a person of ordinary skill would know about the bricks and mortars, would know about the FAST system and the IQEST system. There's no dispute that a person of ordinary skill, that would be within their ken, that there was no technical limitation for them knowing about it. There's no dispute that the brick and mortar systems had filtering systems, that the brick and mortar systems themselves allowed the buyer to specify exactly what they were looking for, allowed the broker to respond exactly with what they were looking for, and to put a predetermined maximum. Just so that we're clear, the brick and mortar systems, if you went to get a home contractor or you went to get a social services, the prior art clearly says the broker would get you no more than three or no more than five, or whichever the social service system was or the home contracting system. Those filtering systems existed exactly in the brick and mortar systems. Those filtering systems existed in FAST and in IQEST. But his argument is not about the filtering system. His argument is about the quote process coming back. So with respect to that... Focus on that. Just focusing on the quote. FAST clearly indicates, and we have the order form as part of the record. When a person entered FAST, they entered all sorts of information into the record. Their name, the part they were looking for, their address, how that could be shipped to them. Again, this is on A943. The details of exactly what they were looking for. That specificity went into the quote system. The supplier that received that did respond to that and had the ability to be able to fulfill that quote. Again, I'm focusing on A943, which describes that. So that's a quote system. We haven't talked at all about the IQEST system. The IQEST system, of course, the buyer knew in advance. The buyer knew in advance exactly what everything would cost. In the IQEST system, when you queried, you picked a database. There were buyer filters. You could pick one database. That's one vendor. You could pick three databases. That's three vendors. Those are all ways of limiting the number of responses you're going to get back. You'd say, I'm looking for an article of a certain type. But that returned article is not quotes, right? I agree, Your Honor. It's not a quote. But what it is, it reflects that there was e-commerce where buyers were making specific requests and getting specific returns with numbers attached so that they knew when they got that response from the vendor, they could say, this is how much it's going to cost me to get this. But I agree, Your Honor. That's not a quote. But the FAS system was a quote. The FAS system was a situation of putting in numbers, details, going to the vendor and the vendor responding and saying, we've got the part, we've got the availability, and that's all there is. By the way, just so we're clear as well, Claim 14 does not require, it doesn't even contemplate, that the transaction is going to be completed by the claim. It just requires that the quote be in response to the request for quotation. There is another point here which I would be, I want to make sure I answer Your Honor's questions, but one of the most important parts is that because there is no dispute about the validity of Claim 13, that is to say, the District Court found Claim 13 was invalid. On this appeal, there has been no argument that that was erroneous. We have cited to Your Honor's three cases, the Burns case, the Westwood case, and the Mendenhall case, all Federal Circuit or Court of Claims decisions. Those cases say, and this is an important structural... What would...  you're suggesting that the FAST anticipated this system, which is... No, I'm not. I thought you said that it had all the elements. No, Your Honor, I was addressing the quotes side of it. We are not in a position to say that actually FAST did everything. What we are saying is, for example, what we can't say is that FAST had a predetermined maximum. That's Claim 14. We are saying that what the court did here is the court looked at what he did is he looked at the e-commerce systems, which had a variety of the elements that are identified in Claim 14 and Claim 13 and 1 through 3, and he looked at the brick-and-mortar systems. Remember, just two of each, two brick-and-mortar, the two e-commerce systems, and said, look, among these, it's relatively clear that a person of ordinary skill in the art would know to computerize the brick-and-mortar systems to achieve this result. But more is the point, and the glue that put this together was the 1992 ACM article. That's the article from the Association of Computing Machinery. That's the filtering stuff. That is. That's correct. That's the filtering stuff. So what the court said is, look, the language of the prior are talks about quotes. There's an argument now about what that is or what that could be. The question is whether one's skilled in the art looking at this plethora of prior art just on these systems would say, well, I understand what this is. This is a system of submitting requests for quotation clearly in the language of facts. What's the motivation to put all this together? I think it was the time, Your Honor. The motivation is there. Yeah, but the time is 1995-96. It is. I don't know if you were around then. I think you were. Were you an Internet user then? No, it was not. The Internet was just being born. I like your term, nascent. So at that point, what's the motivation to the market force to bring all this together as the district court said? But I think, Your Honor, the proof is in the pudding, which is that the FAST and the IQEST systems are examples of what was going on in the market. People were saying, look, and by the way, Dr. Dowling conceded, he conceded the patent is a referral system. Not just by the way, not claims one to three. The patent claims, the two-way embodiments, claims 12, 13, and 14 are all referral systems. Your Honor, that's the question. But those...  seems to be different than what's going on in the claimed invention. We don't think so, Your Honor. What's going on is that buyers and vendors are having communications with each other through a central network or broker. That's what's happening in the brick-and-mortar situation. That's what's happening in the IFAST and the IQEST system. But the brick-and-mortar situation, you have an awful lot of mental filtering going on here, right? Some mental decisions as to which attorneys you're going to refer? That's true. As well as in the... For example... Inevitably, the person I reach on the phone is going to send me their brother-in-law and their best friend, right? That's part of the filtering. That is part of the filtering. Of course, I don't think that's part of this invention, but how is that implemented by the computer? You mean the systems that we're talking about? Yeah. Sure. For example, the FAST documentation before you talks about the relational database. When you put your query into FAST, the first thing that FAST did is not send out the query to 20,000 vendors. It was a relational database. This is discussed in the art. And as a relational database, it first said, wait a minute, who are the vendors that carried this product most recently? Let's query those people first. That's filtering. Now, just to be clear, this is a pre-1995, started in the late 80s system, and this is a system that made a decision and said, you know what, we're going to filter out. Or the IQEST system. The IQEST system, what did you do? You have the ability to select the database. That's equivalent to selecting a vendor. That's filtering. That's your ability to be able to say, I'm going to select this particular source. That also is filtering. So in answer to your honors questions, these filtering systems involving quotes, at least in the FAST system, were being implemented. I suppose you could say that the motivation to combine, residing judge asked, I thought a very good question, where is that motivation to combine? I suppose one possible argument you could make, even though computers were nascent at that time, or the web, I'm sorry, was nascent at that time. That was the inventive, the brilliant idea, the early idea that they had to make this patent, and it's a pity that it was so obvious. Well, I guess I, I wouldn't want to concede that it was inventive to be able to combine these sorts of filtering and communicative systems with what was a brick and mortar system. We think that that was obvious. But yes, your honor, that is the motivation. Everyone was doing it back then. Of course, if our reasoning were always so circular, we wouldn't need the law, would we? No, we wouldn't, your honor. It's obvious because it's obvious. We don't really think in those terms when we do the law, do we? That's right, and I think this is what KSR teaches. What KSR teaches is that we look at what a person, and there's no dispute about this. I mean, what there isn't in the record, Dr. Dowling didn't say a person of ordinary skill wouldn't know about this. A person of ordinary skill wouldn't know about the brick and mortar systems. A person of ordinary skill wouldn't know about the filtering and application of the filtering systems to computers. None of that is stated below. Given the record and given what is clearly the motivation, the market movement, not just in 1995, 96, but well before that in the early 90s for these communication systems and filtering systems to be put together between buyers and vendors, that is where the motivation and suggestion comes from, Your Honor. That's where the teaching comes from. When you're through, if my colleagues have no more questions on the obviousness question, I have a couple of questions on the other part of the discussion. Please. On the infringement issue, let's assume just for argument's sake that we happen to agree with you about the obviousness issue and therefore the patent, Claim 14, which is the only claim at issue, if I understand it correctly. Yes. If we assume for argument's sake that we find it to be invalid, what do you propose we do about the infringement question that you've raised? Your Honor, I think that under the case law that we've cited, technically if you find the, because there's no dispute about Claims 1, 2, 3, and 13 being invalid, they're not an appeal. If you find Claim 14 invalid, I don't think your Honors have to reach the issue of infringement. Now, cardinal chemical doesn't directly fit this case, but nevertheless there's an underlying principle in there, which is, what are you proposing? We would just ignore it or we would vacate the, what should we do about the trial judge's conclusion that you infringed 14? Well, I personally, your Honor, because we feel so strongly that the record is undisputed given the declaration from James Dodson, given the documentation from LendingTree, we would want this court to reach the decision and say we find the patent invalid and by the way, in addition, there was no support for the determination of infringement against LendingTree. But how about if we thought there was support for the infringement conclusion, then what do we do? Again, I think, your Honor, as a practical matter, the decisions that I've read from this court seem to suggest that once the court reaches a gating item, it can decide not to reach other items or it may, it has the discretion to be able to say we're going to reach these other decisions, namely the infringement decision. We think, frankly... Could we vacate the infringement decision in your view? Yes. Do you want to save anything for a rebuttal on your cross-appeal should it arise? Yes, your Honor. Thank you very much. Kaplan, you have four minutes. Thank you, your Honor. First of all, on the issue of Dowling's report using the term quotes, Dowling's a technical witness. He didn't even opine on that. He just used the language from FAST. What's the A943 reference? The A943 reference is talking about what, if you read it, with the rest... A quote and order service is provided whereby clients may state their requirements and authorize FAST to select the best quotation and place an order on their behalf. They can. What happens, your Honor, is all those details go in, as Mr. Stern correctly said, FAST then uses fax, email, computer, internet, and goes and obtains this price and availability. And the fact that it's merely price and availability, again, is in three places in the record. I'm sorry. I forgot one paper. It's at 942, 953, and 954. They then get back, FAST does, the responses that say, spark plugs, 50 cents, this product, 30 cents, whatever it is. They send that to the buyer. The buyer selects that, and then FAST then negotiates with the vendor, and Mr. Stern is right. They can then order it. FAST says, I would like now this product shipped to this person, ship it by tomorrow, I need three dozen of them, et cetera, et cetera. Is this a quote within the definition of the claim? No. What I'm talking about is that there is a request for a quote, but it's a second step that comes from after the database is queried and returned to the buyer. There's then a second step where FAST goes back to the vendor and says, drop ship this to so and so by tomorrow. When the original query of the database is done, it's just an inventory parts database query. At that point, the vendor does not even know who the real buyer is. It's just a database query. But more importantly, and Judge Rader, you hit the nail on the head and I believe your first question to Mr. Stern. More importantly than all of this, this is not that we're coming up and arguing about a fact finding after trial about whether a quote was returned or not. What happened here was that there was not a finding that a quote was returned by the trial court even on summary judgment. I recognize your point. You're not limited to the trial court's basis, Judge Clager. But there's no finding like that. What happened when you read the trial court's opinion is he said that it's obvious to computerized filtering. And again, we're not disputing that for purposes that you could proclaim said a system comprising computerized filtering. You're saying there's facts still in dispute here on the underlying on whether or not a quote was returned. But more importantly, the trial court made no fact finding that way. He just said it doesn't matter. He even uses the words unique feature. He says the unique feature is filtering. Now the other point I want to make about this idea that the brick and mortar had the filtering. Yes, the brick and mortar had the filtering because you don't want 400 home contractors to call you up so you can get the best deal. The whole purpose of the computer search engine technology that they rely upon was to solve that problem. So it makes little sense to believe that when I replaced legal research in books with Westlaw that because I only searched a few books and I didn't have the human bandwidth to search millions of articles that I would somehow limit my computer search to three or four legal research articles. No, I'm going to use the computer to find the best one and that's what Fast and all the e-commerce was doing. That was the purpose of it. Finally, as to the glue to put this together, the market forces to computerize the filtering, I'm sorry, to computerize the purchasing and selling of products that Judge Plager suggested, that market force did exist and people did computerize purchasing and selling and some of the references, one of them, I forget the name of it but it's cited in our brief, goes back to the late 70s. It's the iQuest part. They had a separate part that could buy stuff. People computerized purchasing and selling by search engines to fan out and find part numbers just the way Fast did. It existed for 16 years or so before our patent was filed. The question is not whether it's obvious to put this unique feature or that unique feature. The question is in order to come up with our claimed invention, you need to do this preordainment between the vendors and the central computer and you need also to recognize that you can't just search as widely like all the prior art was strong strongly suggesting and in fact affirmatively working on doing. You need to recognize there's a problem on the vendor side with the system blowing up out of control as we pointed out in our brief. Any secondary considerations? I think there is, Your Honor. The trial judge made this In the record? Yes. The trial judge made this cursory finding but I think we in fact did map the claimed features to the commercial success because we had specific statements from lending trees saying that this technique of this narrowing down and avoiding certain vendors was a key to their commercial success. Any unexpected results? Any licenses? Any Well this was the first Long felt need? This was the first Commercial success is weakest of the secondary considerations. The long felt need, Your Honor, is again the system for buying and selling over the internet and for searching over the internet existed since the 70s. There's art in this record in this appendix showing I think 78 or 79 to buy and sell stuff or try to buy and sell stuff. It was all done buying and selling it's right in our 328 patent. Buying and selling over a computer was not new. If you wanted all the terms you had a central database and if you wanted to do searching for remote vendors, you search far and wide to get the best deals. That was the whole point of what they were doing. Unless there be any doubt about this, let's not forget that the defendants themselves with experts in e-commerce ended here as well. Mr. Stern says Kaplan Final Words? Yes. Mr. Stern says the brick and mortar audit is the first place they would have looked but we had this case going on for three years with experts on their side with our patent and no one thought to look there. They've never presented anything. Why not? Thank you Judge. Mr. Stern, I didn't hear anything on the cross appeal. I didn't hear anything either, Your Honor. If I may, I haven't addressed our cross appeal. It didn't arise so it's kind of hard to bring it up at this point. Do you have a final word for us? I do, Your Honor. Based on the record and on the undisputed facts, not the arguments being made now, but on the undisputed facts, Judge Debel was absolutely right in finding the patent invalid. Thank you, Mr. Stern. Our next case is Acceptance Insurance v. United States.